UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
ROSEMARY MAZZOLA,                                             :
                                                              :    1:20-cv-07582 (GHW)
                              Plaintiff,                      :
                                                              :    **FIRST AMENDED COMPLAINT**
           vs.                                                :
                                                              :
                                                              :
PRIME EFS, LLC and TRANSPORTATION                             :
AND LOGISTIC SYSTEMS, INC. (f/k/a                             :
PETROTERRA CORP.),                                            :
                                                              :
                              Defendants.                     :
                                                              :
------------------------------------------------------------ X

      Plaintiff Rosemary Mazzola ("Mazzola" or "Plaintiff"), by and through her attorneys, Sichenzia Ross Ference LLP, alleges through this First Amended Complaint against defendants Prime EFS, LLC ("Prime") and Transportation and Logistics Systems, Inc. ("TLS") (f/k/a PetroTerra Corp.) ("PetroTerra") (collectively, Prime, TLS and PetroTerra are the "Defendants") (collectively, Plaintiff and Defendants are the "Parties") as follows:

### PRELIMINARY STATEMENT

      1.      On or about June 18, 2018, PetroTerra (now known as TLS) acquired a wholly-owned, operating subsidiary, Prime, pursuant to a Stock Purchase Agreement dated June 18, 2018 ("SPA"). As consideration for that acquisition, pursuant to which PetroTerra became Prime's only member, PetroTerra agreed, *inter alia*, to pay to Plaintiff, as the outgoing manager and majority member of Prime, the sum total of $489,174.00 in cash consideration for her 51.5% membership interest ("Cash Consideration").

      2.      Plaintiff's share of the cash consideration was to be paid at the time of closing under the SPA. Notwithstanding, Defendants failed to pay Plaintiff the Cash Consideration to which she was entitled under the SPA at the time of closing.

      3.      On information and belief, because of working capital issues, Defendants asked Plaintiff not to enforce her rights with respect to the Cash Consideration that was due to her.

Defendants proposed an amendment to the SPA, whereby Plaintiff would receive cash consideration payment priority over all other members; indeed, she would become the only member of Prime to receive a cash payment *if* Plaintiff would agree to *not* enforce her rights against Defendants who had defaulted.

4. Plaintiff agreed, and on September 30, 2018, PetroTerra and Prime's members entered into an Amended and Restated Stock Purchase Agreement ("Amended SPA"), pursuant to which PetroTerra and Prime (its wholly-owned operating subsidiary) agreed to pay Plaintiff (and no other members) the Cash Consideration.

5. Both Prime and TLS agreed to pay the Cash Consideration, and, as set forth more fully below, reported this financial obligation to the United States Securities and Exchange Commission ("Commission") and the marketplace in its public filings.

6. Defendants defaulted and $209,000.00 remains due and owing to Plaintiff.

7. As a result of Defendants' breach of the Amended SPA, Plaintiff is entitled to damages in an amount no less than $209,000.00, as well as her costs and attorneys' fees.

## THE PARTIES

8. Plaintiff is the former Manager of Prime, and is a resident of New Jersey. She was a signatory to both the SPA and Amended SPA.

9. Prime is a New Jersey limited liability company with a principal place of business located as 212 Washington Avenue, Carlstadt, New Jersey 07072. Prime is in the trucking and transportation business and, as set forth more fully below, Prime is the wholly-owned operating subsidiary of TLS (and its predecessor PetroTerra).

10. TLS is a publicly traded, Nevada corporation with a principal place of business located at 5500 Military Trail, Suite 22-357, Jupiter, Florida 33458. TLS is the only member of Prime.

11. According to their public disclosures filed with the Commission, TLS is a logistics

and transportation companying specializing in "eCommerce fulfillment." TLS operates through its wholly-owned subsidiaries, Prime and non-party Shypdirect LLC, and controls, recognizes and reports the assets, liabilities, revenue and other obligations of Prime and Shypdirect LLC as a single – not separate and distinct – segment in its public filings. According to their public disclosures, TLS and Prime operate in New York, New Jersey, Pennsylvania, Ohio, Tennessee, Georgia and Florida.

12. Since on or about April 16, 2019, non-party John Mercadante ("Mercadante") has been the Chairman of the Board of Directors, Chief Executive Officer, President and Principal Financial Officer of TLS as well as the Chief Executive Officer of Prime and non-party Shypdirect LLC. On information and belief, Mr. Mercadante is a resident of the State of Florida.

13. Since on or about April 16, 2019, non-party Douglas Cerny ("Cerny") has been the Chief Development Officer and Director on the Board of Directors of TLS as well as the Vice President and Secretary of Prime and non-party Shypdirect LLC. On information and belief, Mr. Cerny is a resident of the State of Florida.

14. On information and belief, and as set forth more fully herein, Mercadante and Cerny have intentionally caused TLS to: dominate and control every aspect of Prime; disregard the corporate formalities between parent and subsidiary, to inadequately capitalize Prime; cause Prime to apply for a Paycheck Protection Program loan ("PPP loan") and, upon receipt of such proceeds siphon a proportionate amount of operating capital (equal to the PPP loan amount) out of Prime and into TLS for uses unrelated to Prime but as directed by TLS; and to dishonor the many contractual obligations of Prime (including as to repayment of the PPP loan and payment of the full amount of Cash Consideration due to Plaintiff) at the same time as stripping out all of Prime's revenue and operating capital.

**JURISDICTION AND VENUE**

15. Jurisdiction is proper as there is diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs pursuant to 28 U.S.C. § 1332.

16. Section 9.8 of the Amended SPA (and of the SPA) contain a forum selection, choice

of law and waiver provision ("Forum Selection Clause") that governs this dispute, which provides in relevant part:

> <u>Governing Law and Venue</u>. This Agreement shall be construed in accordance with, and governed by, the laws of the State of New York (without giving effect to its choice of law principles). Each party hereto (a) irrevocably submits to the exclusive jurisdiction and venue of any state or federal court located within New York County in the State of New York (or any appellate courts thereof) in connection with any Action arising out of or relating to this Agreement or the transactions contemplated hereby (a "***Proceeding***"), (b) agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth in Section 9.8 shall be effective service of process for any Proceeding with respect to any matters to which it has submitted to jurisdiction in this Section 9.8, and (c) waives and covenants not to assert or plead, by way of motion, as a defense or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of such court, that the Proceeding is brought in an inconvenient forum, that the venue of the Proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court, and hereby agrees not to challenge such jurisdiction or venue by reason of any offsets or counterclaims in such Proceeding.

A true and correct copy of the SPA and Amended SPA are annexed hereto, respectively, as **Exhibits 1 and 2**.

17. The law of this State recognizes forum selection clauses, as such as the above, and presumes them to be enforceable. PetroTerra was aware of the Forum Selection Clause, as it was a signatory to the Amended SPA (and SPA), and the Forum Selection Clause was mandatory rather than permissive. At all relevant times, PetroTerra was represented by its own corporate counsel from Pryor Cashman LLP in the negotiation and execution of these arm's length transactions. As alleged herein, the Amended SPA encompasses the claims and Parties to this action, and therefore, is binding on the Parties hereto.

## GENERAL ALLEGATIONS

### PetroTerra (now TLS), Prime and Plaintiff Enter Into the SPA

18.     On June 18, 2018, PetroTerra, now known as TLS[1], completed the acquisition of one hundred percent (100%) of the issued and outstanding membership interests of Prime from its members pursuant to the terms and conditions of the SPA.  The parties to the SPA were: PetroTerra, Prime, and Plaintiff, as well as various prior members of Prime.  PetroTerra disclosed the transaction and filed a copy of the SPA as Exhibit 10.3 to its Form 8-K filed with the Commission on June 27, 2018.

19.     As consideration for the acquisition pursuant to the SPA, PetroTerra agreed to pay Plaintiff, as then-Manager of Prime, and the previous members of Prime a total of $1,000,000.00 in cash consideration.  Plaintiff's share, based on her 51.5% interest in Prime, was $489,174.00.

20.     PetroTerra also simultaneously caused Prime, as its wholly-owned subsidiary, to execute a Security Agreement and Guarantee in favor of its parent company, PetroTerra, in order to induce a third-party investor to provide financing for, in part, the acquisition of Prime, in the aggregate principal amount of $2,497,502.00. True and correct copies of the executed Security Agreement and Subsidiary Guarantee are annexed collectively hereto as **Exhibit 3**.  PetroTerra disclosed the transaction, including as to the upstream guarantees by the wholly-owned subsidiary (Prime) in favor of the parent company, in its Form 8-K filed with the Commission on June 27, 2018.

21.     Defendants failed to pay Plaintiff her Cash Consideration, which default constituted a breach of the SPA.

### Defendants Breach the SPA as Amended

22.     On information and belief, because of working capital constraints, at least non-party

---

[1] On or about July 17, 2018, PetroTerra announced a reverse split of its common stock and a name change to Transportation and Logistics Systems, Inc.  Defendants announced the reverse stock split and name change in its Form 8-K filed with the Commission on July 23, 2018.

Steve Yariv (the former Chief Executive Officer and Chairman of the Board of Directors of TLS and, through TLS, the managing member of Prime) asked Plaintiff to not enforce her contractual right to full payment of the Cash Consideration at the time of closing under the SPA.

23.  As consideration for same, PetroTerra (now TLS) and all former members of Prime entered into the Amended SPA, pursuant to which Defendants prioritized payment of the Cash Consideration to Plaintiff and all other former members of Prime received non-cash consideration. Plaintiff agreed not to enforce her rights under the SPA and, and on September 30, 2018, Plaintiff, PetroTerra and Prime entered into the Amended SPA.

24.  Pursuant to the terms of the Amended SPA, PetroTerra agreed to pay Plaintiff (and no other members) the Cash Consideration of $489,174.00.

25.  On information and belief, TLS and Prime were in need of operating capital until alternative *post*-acquisition financing was available. Accordingly, Defendants requested that Plaintiff agree that Defendants retain the Cash Consideration for up to thirty (30) days and agreed to cause their attorneys at Pryor Cashman LLP to provide Plaintiff with a written note evidencing same.

26.  Under the circumstances, a written agreement setting forth the terms of repayment of the Cash Consideration was required under Section 9.6 of the Amended SPA, which provides in relevant part:

> This Agreement may not be amended, modified or supplemented except by an instrument in writing signed by Buyer, the Company and a Seller Majority; provided, that no such amendment will adversely affect the rights or obligations of a Seller hereunder in a disproportionate manner to any other Seller without the prior approval of such Seller. No provision of this Agreement may be waived orally or by any act or failure to act on the part of a Party, but only by an agreement in writing signed by the Party against whom enforcement of any such waiver is sought.

27.  Defendants, however, never produced a written agreement modifying the terms of the Amended SPA despite their stated intention to Plaintiff to do so.

6

28. At no point did Defendants pay Plaintiff the full Cash Consideration; instead, each Defendant made a series of partial payments to Plaintiff to pay-off the Cash Consideration due to Plaintiff under the Amended SPA.

29. For example, on or about October 6, 2019, TLS wired the amount of $10,000.000 to Plaintiff's individual bank account held at Wells Fargo Bank, N.A., Account Number xxxxxx5755 ("Wells Fargo Account"). Furthermore, on or about October 15, 2019, TLS wired an additional amount of $90,000.00 to Plaintiff's Wells Fargo Account. TLS paid Plaintiff $100,000.00 of the Cash Consideration.

30. Prime also made payments to Plaintiff of an additional $180,174.00 of the Cash Consideration due under the Amended SPA.

31. Thereafter, Defendants defaulted, leaving a balance of $209,000.00 due and owing to Plaintiff under the Amended SPA.

32. Notably, Defendants conceded the $209,000.00 due and owing to Plaintiff for the sale of her majority interest in Prime to TLS in Defendants' Form 10-Q for the quarter ended September 30, 2019, which Defendants filed with the Commission on November 19, 2019. A true and correct copy of the relevant portions of the Form 10-Q for the quarter ended September 30, 2019 is annexed hereto as **Exhibit 4**. The Form 10-Q provides in relevant part:

> In connection with the acquisition of Prime, the Company [defined in the Form 10-Q as TLS "and its wholly-owned subsidiaries, Prime and Shypdirect"] acquired a balance of $14,019 that was due from the former majority owner of Prime. Pursuant to the terms of the SPA, the Company agreed to pay $489,174 in cash to the former majority owner of Prime [*i.e.*, Plaintiff] who then advanced back the $489,174 to Prime. During the nine months ended September 30, 2019, the Company repaid $50,000 of this advance. This advance is non-interest bearing and is due on demand. At September 30, 2019 and December 31, 2018, amount due to this related party amounted to $209,000 and $259,000."

33. Plaintiff has demanded of Defendants payment of the full amount of the Cash

7

Consideration. Despite said demand, Defendants have failed to pay to Plaintiff the outstanding balance of the $209,000.00 due and owing to her for her sale of her majority interest in Prime to TLS.

34. Accordingly, as a result of Defendants' breach, Plaintiff has been damaged in an amount no less than $209,000.00.

35. Plaintiff also is entitled to payment of her costs and reasonable attorneys' fees in bringing this action to enforce her rights under the Amended SPA. Section 9.11 of the Amended SPA provides, in relevant part, as follows:

> If any Proceeding is brought or undertaken to enforce this Agreement, or because of an alleged dispute, breach or default in connection with any of the provisions of this Agreement, then the successful or prevailing Party or Parties in such undertaking shall be entitled to recover reasonable attorney's and other professional fees and other costs incurred in such Proceeding in addition to any other relief to which such Party may be entitled. The Parties intend this provision to be given the most liberal construction possible and to apply to any circumstances in which such Party reasonably incurs expenses.

### Non-Parties Mercadante and Cerny Cause TLS to Dominate and Control Every Aspect of Prime and Plaintiff Is Entitled to Pierce the Corporate Veil

36. On information and belief, Mercadante and Cerny have intentionally caused TLS, *inter alia*, to dominate and to control every aspect of Prime and disregard the corporate formalities between parent and subsidiary.

37. On June 13, 2018, the Board of Directors of PetroTerra unanimously consented to TLS entering into the SPA to acquire all of the membership interests of the members of Prime, including Plaintiff. A true and correct copy of the Written Consent of the Board of Directors of PetroTerra Corp., dated June 13, 2018, is annexed hereto as **Exhibit 5**.

38. On or about August 19, 2019, TLS filed with the Commission a Form 10-Q for the quarterly period ended June 30, 2019, which confirmed that the parent company – TLS – had completed the acquisition of all of the issued and outstanding membership interests of Prime pursuant to the terms of the SPA on June 18, 2018. A true and correct excerpted copy of the Form 10-Q for

the quarterly period ended June 30, 2019 is annexed hereto as **Exhibit 6**.

39. The Form 10-Q for the quarterly period ended June 30, 2019 also discloses that, with respect to the organization and operation of TLS and its wholly-owned subsidiaries, including Prime, TLS enters into service agreements for the delivery of packages and "believes that it operates in one operating segment related to deliveries for on-line retailers in New York, New Jersey and Pennsylvania and tractor trailer and box truck deliveries of product on the east coast of the United States from one distributor's warehouse to another warehouse or from a distributor's warehouse to the post office."

40. Despite that Prime reported gross revenue of $16,970,355.00 in the first six months of 2020, on or about April 27, 2020, TLS filed a Form 8-K with the Commission, which disclosed that, on April 8, 2020, Prime also had applied for a loan available under the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief and Economic Security Act of 2020 (the "CARES Act").

41. On April 22, 2020, Prime received $2,941,212.50 in PPP loan proceeds.

42. Mercadante signed and secured the repayment obligation on the PPP loan with a promissory note in which he indicated that he was the "Authorized Representative" of Prime and listed his address as 212 Washington Avenue, Carlstadt, New Jersey 070772. A true and correct copy of the PPP loan note is annexed hereto as **Exhibit 7**.

43. Mercadante also signed and certified TLS' Form 10-Q filing with the Commission, for the quarter ended June 30, 2020, in which TLS disclosed five (5) separate lawsuits against TLS and Prime that could materially adversely affect the business operations, property or financial condition of Prime, to wit: (i) *Elrac LLC v. Prime EFS*, filed on January 10, 2020, in the United States District Court for the Eastern District of New York and assigned Case No. 1:20-cv-00211, which seeks damages of approximately $622,000.00; (ii) breach of a settlement agreement, captioned as *BMF Capital v. Prime EFS LLC et al.*, and as to which Prime has valued its potential liability at $10,000.00; (iii) *Bellridge Capital, L.P. and SCS, LLC v. TLS*, in which investors seek approximately

9

$1,978,557.76 - $2,271,099.83 based on TLS' breach of various agreements; (iv) *SCS, LLC v. Transport and Logistics Systems, Inc.*, filed on May 26, 2020, in the New York State Supreme Court, County of New York, and assigned Index No. 154433/2020, which seeks damages of $42,000.00; and (v) *SCS, LLC, derivatively on behalf of Transportation and Logistics Systems, Inc. v. John Mercadante, Jr., Douglas Cerny, Sebastian Giordano, Ascentaur LLC and Transportation and Logistics Systems, Inc.*, in the 5th Judicial Circuit in and for Palm Beach County, Florida and assigned Case No. 2020-CA-006581, which seeks unspecified damages on behalf of investors for breach of fiduciary duties against the defendants, among other claims.

44. Although Mercadante caused Prime to segregate the loan proceeds in a new Prime account from which it then paid its payroll obligations, he also ordered Prime to make multiple wire transfers from its operating account to TLS' corporate account in an aggregate amount equal or substantially equal to the amount of the PPP loan thereby stripping critical operating capital out of Prime. These monies were wired as directed.

45. On information and belief, this exodus of operating capital from subsidiary to parent company were then used by TLS to pay TLS' creditors and other debts but *not* to pay Plaintiff her full Cash Consideration.

46. On information and belief, at the behest of and under the absolute control of Mercadante, TLS disregarded the corporate form of Prime and used it to perpetrate an unlawful act in which millions of dollar of operating capital were wrenched out of Prime and diverted away from making payments on bona fide operational expenses and indebtedness of Prime, and instead were sheltered at the parent corporate level for unlawful purposes leaving Prime undercapitalized.

47. On or about November 16, 2020, TLS filed with the Commission a Form 10-Q for the quarter ended September 30, 2020, which reported third quarter revenue of $6,309,509.00. A true and correct copy of the excerpted Form 10-Q is annexed hereto as **Exhibit 8**.

48. Despite its millions of dollars in quarterly revenue and its multi-million dollar PPP

loan, on or about October 12, 2020, Prime notified Plaintiff, in writing, that it mysteriously had no revenue, and, therefore, it had terminated all of its operations effective September 30, 2020. A true and correct copy of the notice dated October 12, 2020 is annexed hereto as **Exhibit 9**.

49. On information and belief, TLS completely dominated every aspect of the operations and management of its wholly-owned subsidiary, Prime, and used its subsidiary like a personal "piggy bank" for harvesting revenue.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Breach of Contract – As to All Defendants)**

50. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51. Plaintiff, PetroTerra (now TLS) and Prime entered into a valid binding contract – specifically, the Amended SPA.

52. Plaintiff performed any and all conditions precedent and obligations for which she is seeking payment under the Amended SPA – specifically, foregoing her right to immediately enforce her right to payment of the Cash Consideration, *i.e.*, $489,174.00, due and owing to her at the time of closing pursuant to the SPA.

53. Defendants breached the Amended SPA by defaulting on their obligation to pay Plaintiff the full Cash Consideration under the Amended SPA.

54. As a result of Defendants' breach, Plaintiff has been damaged in an amount no less than $209,000.00.

55. Plaintiff has demanded payment of the full Cash Consideration, but Defendants have failed to pay to Plaintiff the $209,000.00 that is due and owing to her under the Amended SPA.

56. Plaintiff is further entitled to her costs and reasonable attorneys' fees in bringing this action pursuant to Section 9.11 of the Amended SPA.

## AS AND FOR A SECOND CLAIM FOR RELIEF
**(Piercing the Corporate Veil – As to TLS)**

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. Prime is the wholly-owned, operating subsidiary of TLS.

59. At all relevant times, TLS utilized Prime as the operating branch and primary revenue source in order to shield TLS from liability.

60. At all relevant times, Prime generated significant and accelerated revenue growth, but Prime was grossly undercapitalized, was forced by TLS to secure and guarantee certain also and indebtedness incurred by TLS, and was frequently caused to transfer all or a substantial portion of its operating capital to TLS at the mere request of officers and directors of TLS.

61. At all relevant times, Mercadante was the Chief Executive Officer, Chief Financial Officer, President and Chairman of the Board of Directors or otherwise employed in a position of control within TLS. Prime employees were, at times, directly controlled by Mercadante or other officers of directors or TLS.

62. TLS exerted such control over Prime that the subsidiary was a mere conduit of the parent company for the purpose of shielding the parent company from liability.

63. As set forth more fully herein, Prime was an instrumentality of TLS, and was utilized by TLS and officers and directors who dominated and controlled TLS, to perpetrate unlawful, unjust and fraudulent actions.

64. Plaintiff is entitled to pierce the corporate veil of Prime, and to collect any judgment levied against Prime from TLS, which also made $100,000.00 of Cash Consideration payments to Plaintiff.

65. As set forth in the Form 10-Q for the quarter ended September 30, 2019, Prime and TLS are and intended to be collectively responsible for Plaintiff's Cash Consideration.

66. As set forth in the Form 10-Qs and 10-Ks of TLS, TLS and Prime are and intend to be collectively responsible for the Cash Consideration due Plaintiff under the Amended SPA.

67. As set forth in the Form 10-Q of TLS, with respect to the organization and operation of TLS and its wholly-owned subsidiaries, including Prime, TLS enters into service agreements for the delivery of packages and "operates in one operating segment related to deliveries for on-line retailers in New York, New Jersey and Pennsylvania" not as separate and distinct lines of business.

68. In other words, TLS' public disclosures and filings with the Commission are unequivocal that as between TLS and its subsidiary, there exists a common business, control and extensive integration of operations and management of the enterprise.

69. Prime took all managerial and operational directions from Mercadante, as TLS' Chief Executive Officer, Chief Financial Officer, President and Chairman, and Cerny, as TLS' Vice President and Director.

70. Under Mercadante, TLS did not observe corporate formalities; rather, TLS regularly directed officers of Prime to transfer funds out of Prime to TLS, to comingle assets or to make payments to third-party creditors on behalf of the parent company.

71. TLS treated Prime as its "piggy bank."

72. For example, in or around April 2019, Mercadante ordered Prime's chief financial officer to make a $100,000.00 payment from Prime's operating account to a third-party investor that had provided financing to TLS for, in part, its acquisition of Prime (the repayment of which TLS also made Prime guarantee). The payment was wired as directed.

73. By way of further example, in or around April 2019, Mercadante ordered Prime's chief financial officers to wire $30,000.00 to Mercadante's personal checking account and $30,000.00 to Cerny's personal checking account. Neither Mercadante nor Cerny provided any explanation or justification for the personal wires of Prime's operating capital. The payments were wired as directed.

74. By way of further example, in or around May 2019, Mercadante ordered Prime's chief financial officer to pay TLS's accountants approximately $67,000.00 from Prime's operating account. The payment was wired as directed.

75. By way of further example, in or around October 2019, Mercadante order the chief financial officer of Prime to wire a $5,000.00 payment from its operating account to pay for an engagement entered into between TLS and a FINRA registered broker-dealer pursuant to which TLS sought to raise capital through a private offering of securities. The payment was wired as directed.

76. By way of further example, in November 2019, Mercadante ordered Prime's chief financial officer to wire a $53,000.00 payment from Prime to TLS's accountants. The payment was wired as directed.

77. By way of further example, in or around December 2019, Mercadante ordered the chief financial officer of Prime to wire operating capital from Prime's account to third parties for TLS' debts: $28,424.74 for real estate expenses of TLS; $10,000.00 to Pryor Cashman LLP (attorneys for TLS); and $30,000.00 in referral fee payments to a broker for facilitating a transaction in which an investor engaged in a financing with TLS.

78. By way of further example, in or around December 2019, Mercadante ordered the chief financial officer of Prime to wire operating capital from Prime's account to third party consultant, in the amount of $10,000.00, pursuant to a written consulting agreement between the consultancy and TLS, for facilitating a transaction in which an investor engaged in a financing with TLS for payment. TLS caused Prime to make payments to this consultant, from Prime's operating account, totaling approximately $50,000.00.

79. By way of further example, in January 2020, Mercadante ordered Prime's chief financial officer to make a $25,000.00 payment from Prime to the third-party investor that had provided financing to TLS for, in part, its acquisition of Prime (the repayment of which TLS also made Prime guarantee). The payment was wired as directed.

80.     By way of further example, in January 2020, Cerny (also an officer and director of TLS) ordered Prime's chief financial officer to wire to TLS' corporate account $239,000.00. Mercadante was copied on the email between parent company and subsidiary. Neither Cerny nor Mercadante provided any explanation or justification for ordering the subsidiary to wire its operating capital to the parent company. The payment was wired as directed.

81.     By way of further example, in March 2020, Mercadante ordered an employee of Prime to wire the following payments from Prime's operating account to third parties for TLS' debts: $28,424.74 for real estate expenses of TLS; $10,000.00 to Pryor Cashman LLP (attorneys for TLS); $30,000.00 in referral fee payments to a broker for facilitating a transaction in which an investor engaged in a financing with TLS.

82.     Despite the tens of millions of dollars of revenue growth, Mercadante also ordered Prime's chief financial officer undercapitalize Prime; to maintain capital only to the extent necessary to maintain Prime's short term operations.

83.     Under Mercadante, TLS caused Prime to apply for nearly $3 million in PPP loans despite that Prime was concurrently generating millions of dollars of quarterly revenue, and, upon receipt of such loan proceeds, ordered Prime to wire a proportionate amount of operating capital our of Prime to TLS for TLS' use – *not* Prime.

84.     Under Mercadante, TLS caused Prime to default on its PPP loan covenants and to withhold disclosure of such default from Prime's lending institution.

85.     TLS also paid $100,000.00 of the $489,174.00, *i.e.*, the Cash Consideration, due to Plaintiff.

86.     All of the foregoing events constituted a total control and domination of Prime by TLS as well as a disregard of all corporate formalities.

87.     Upon information and belief, at all relevant times, Prime also failed to hold a meeting of its members, officers and directors. Together with the myriad examples of TLS treating Prime's

15

operating capital and accounts as indistinct from TLS' operating capital and accounts, all of the foregoing make clear the non-function of Prime's other officers and directors.

88. TLS utilized Prime to perpetrate the unlawful acts detailed herein against Plaintiff.

89. Under Mercadante, TLS also directed officers of Prime to unlawfully withhold full payment of the balance of $209,000.00 due and owing to Plaintiff under the Amended SPA.

90. TLS also caused Prime to be insolvent.

91. As a result of Defendants' wrongful and fraudulent activities, Plaintiff is entitled to pierce the corporate veil and hold TLS liable for the liabilities of Prime in an amount to be determined at trial, but believed to be not less than approximately $209,000.00, as well her attorneys' fees and costs.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Unjust Enrichment – As to All Defendants)

92. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93. Pursuant to the Amended SPA, Defendants agreed to pay Plaintiff her full Cash Consideration after retaining that amount.

94. Defendants failed to pay the remaining $209,000.00.

95. Alternatively, it would be against equity and good conscience to permit Defendants to retain those amounts that are due and owing to Plaintiff, in an amount no less than $209,000.00.

**WHEREFORE,** Plaintiff demands judgment as follows:

i) Entry of judgment in her favor in an amount to be determined at trial, but believed to be not less than approximately $209,000.00, representing said amounts that Defendants owe Plaintiff pursuant to the Amended SPA;

ii) Plaintiff's reasonable attorneys' fees and costs in bringing this action pursuant to the Amended SPA; and

    iii)    That the Court grant Plaintiff such other and further relief as it considers just and proper.

Dated: November 23, 2020

                                            SICHENZIA ROSS FERENCE LLP

                              By: */s/ Daniel Scott Furst*
                                    Daniel Scott Furst, Esq.
                                    Thomas P. McEvoy, Esq.
                       1185 Avenue of the Americas, 37th Floor
                       New York, New York 10036
                       (212) 930-9700

                       *Attorneys for Plaintiff Rosemary Mazzola*